Antonie Cerveny, appellee, v. Virginia Cerveny et al.,
appellants.

46 N. W. 2d 632

Filed March 9, 1951.   No. 32843.

(1)

*Fischer, Fischer & Fischer,* and *Ben F. Shrier,* for appellants.

*Thomas Zacek* and *William R. Patrick,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

Antonie Cerveny brought this action in the district court for Douglas County against Virginia Cerveny and Virginia Cerveny, executrix under the last will and testament of Charles J. Cerveny, deceased. The purpose of the action is to have a certain warranty deed declared void because of the nondelivery thereof, to have the recording thereof canceled, and to have the title to the property described therein quieted in the plaintiff. The trial court found generally for the plaintiff and decreed the deed to be void, ordered the record thereof in the office of the register of deeds be expunged, and quieted title of the premises described in the deed in the plaintiff. Defendants filed a motion for new trial and, from the overruling thereof, have appealed.

The description of the property involved is the west 90 feet of Lot 24, Block 12, Brown Park, an addition to the city of South Omaha, now the city of Omaha, as surveyed, platted, and recorded in Douglas County, Nebraska.

This action being equitable in its nature is reviewable here de novo. See section 25-1925, R. R. S. 1943. However, "* * * the court will, in determining the weight of the evidence, where there is an irreconcilable conflict on a material issue, consider the fact that the

trial court observed the witnesses and their manner of testifying." W. L. Phillips Sons v. Northwest Realty Co., 152 Neb. 808, 43 N. W. 2d 6.

For convenience we will refer to appellee as Antonie and to appellant Virginia Cerveny as Virginia.

John and Antonie Cerveny were husband and wife. Some time prior to his death on May 29, 1922, he had become the owner of Lots 23 and 24, in Block 12, in Brown Park Addition to the city of South Omaha, now the city of Omaha, as surveyed, platted, and recorded in Douglas County, Nebraska. On these two lots are two houses and a frame business building, the latter with two street addresses. The address of the house which is located on the east 40 feet of Lots 23 and 24 is 1911 Q Street; that of the house which is located on the west 90 feet of Lot 23 is 5205 South 20th Street; and the addresses for the frame business building which is located on the west 90 feet of Lot 24 are 5201 and 5203 South 20th Street. By warranty deed dated February 3, 1921, John conveyed this property to his wife, Antonie.

Up to the time of his death John Cerveny operated a tavern in the business building. After his death Antonie continued to operate this business for about a year. Then she quit the business and rented all the properties except the house located at 5205 South 20th Street. That is where the family lived. The family, at the time of John Cerveny's death, consisted of Antonie and six living children. The children were Frank, Charles, Sylvia, Joe, Mary, and Anna. Frank was married and not living at home. The other five children were living at home. Of the five children living at home, Charles, who is also referred to as Charley, Charles J., and Karl, was the oldest, being then 22 years of age. He was working and helped support the family. He continued to live at home and help support the family until July 1935 when he was married.

After he married Charles established his own home.

For some years he lived in the house located at 1911 Q Street, but in 1942 he and his family moved to 4811 South 13th Street where they lived until Charles died on February 24, 1949, at 'the age of 49 years. He left surviving him his wife, Virginia, and four children ranging between the ages of 4 and 12 years. Antonie, the mother of Charles, was, at the time of the trial, 75 years of age.

Charles, during his lifetime, operated a tavern at 5201 South 20th Street and rented the property from his mother for that purpose. After' his death his wife, Virginia, continued to operate the tavern business and, on March 14, 1949, entered into a lease with Antonie leasing this same business property at 5201 South 20th Street for the period from April 2, 1949, to April 2, 1954, for that purpose.

It is apparent that during his entire lifetime the relationship between Charles and his mother was close and on a very congenial basis. From the time of the father's death until in July 1935, when he was married, Charles lived at home with his mother and helped support the family. While he no longer lived in the home of his mother after his marriage he had his business nearby and was an almost daily visitor in her home.

On August 24, 1934, Antonie executed warranty deeds to the properties hereinbefore referred to. When she did so Charles went with her to the office of the notary public who had prepared the deeds. He saw her sign the deeds. She then took the deeds home and put them in a safe. This safe she always kept in her bedroom. No one knew the combination to this safe besides herself except possibly Charles. Charles had been present when the combination thereof had to be fixed shortly after the father's death. He, at that time, heard the combination explained to his mother.

Antonie testified she never delivered these deeds to the grantees named therein nor to anyone for them; that she did not intend that the deeds should be theirs in her

lifetime; and that shortly after Charles died she went to the safe to look for the deeds but the ones to Charles and Anna were not there, although she had never, prior to that time, looked for the deeds since placing them in the safe on August 24, 1934.

The three deeds she executed were as follows: To Charles the property at 5201-5203 South 20th Street; to Anna Kutilek the property at 1911 Q Street; and to the other four children the property at 5205 South 20th Street.

On March 24, 1937, Antonie wrote out a statement in the Czech language which was apparently intended for Charles and, after his death, found among his papers. While there is a sharp dispute as to the correct translation of this statement, particularly one sentence thereof, we think the translation thereof made by the court appointed interpreter to be correct. Insofar as here material, this statement contains the following:

"I also gave Charles two recommendations (or could mean, gave Charles two instructions) in the event of my death

"One (1.) deed was for Charles Cerveny and the other was for Anna Kutilek so that each would put his on record after my death so that there would be no misunderstanding about it the other children have their share. Three (3) deeds here in the residence 5205 So 20 str in the safe

Mother<br>Antonie Cerveny

they are Frank. Joseph. Marie. Silvy."

Sometime after this statement was written the deed therein mentioned for Charles Cerveny was seen in his possession. Several witnesses testify to seeing it, one as early as either late in 1937 or the early part of 1938. It was found among his papers after his death as was also the deed to Anna Kutilek.

"The possession of a deed by the grantee, in the absence of opposing circumstances, is prima facie evidence

of delivery, and the burden of proof is on him who disputes this presumption." Kellner v. Whaley, 148 Neb. 259, 27 N. W. 2d 183.

"* * * if a deed fully executed is found in the possession of the grantee, it is presumed to have been delivered by the grantor, and accepted by the grantee, at the date of its execution." Colbert v. Miller, 149 Neb. 749, 32 N. W. 2d 500.

Charles did not during his lifetime, and Virginia does not now, raise any question as to Antonie's right to the use and enjoyment of the property during her lifetime.

"A deed, delivered to grantee in grantor's lifetime, is operative, though enjoyment of estate conveyed is postponed until grantor's death, as present estate or interest is transferred by such delivery." Colbert v. Miller, *supra.* See, also, Kellner v. Whaley, *supra.*

In view of the foregoing the payment of taxes, insurance, and repairs on the premises by Antonie, although it is evident Charles provided some of the money for this purpose, together with the leases entered into by her with Charles and Virginia were in no way inconsistent with the delivery of the deed.

"In suit to set aside deed to defendant for want of delivery, plaintiffs have the burden of proving nondelivery of deed and producing evidence to overcome presumption of delivery due to defendant's possession of deed." Colbert v. Miller, *supra.*

As quoted from McGee v. Allison, 94 Iowa 527, 63 N. W. 322, in Kellner v. Whaley, *supra:* "'* * * This presumption is not conclusive, but it raises a strong implication, which can only be overcome by clear and satisfactory proof. Tunison v. Chamberlain, 88 Ill. 379. Such a rule is necessary to the security of titles. Any other would render all holdings uncertain, and would be disastrous in the extreme. * * *'"

In Kellner v. Whaley, *supra,* we said: "This court has, from an early date, consistently held that delivery is largely a question of intent to be determined from

the facts and circumstances of the given case.

"In the case of Brittain v. Work, 13 Neb. 347, 14 N. W. 421, it was stated: 'No particular act or form of words is necessary to constitute a delivery of a deed. Anything done by the grantor from which it is apparent that a delivery was intended, either by words or acts, or both combined, is sufficient.'"

After Antonie executed the deeds she took them home and put them in her safe. She then voluntarily wrote the statement of March 24, 1937, to clarify the situation in regard thereto. In this statement she recognized the deed as being his (Charles) but instructed him not to put it of record until after her death. This was entirely proper and consistent with delivery. Much is made of the fact that the statement indicates she then had all three deeds in the safe at that time. Even so, they could have rightfully come into the possession of Charles subsequent thereto. In fact, they were in his possession shortly thereafter. The rights arising by reason of his possession are not overcome by the possibility that Charles could have taken the deeds out of the safe, since he probably knew the combination thereof. Such possibility is pure speculation and not proof of how he actually came into possession of the deed. We do not find the evidence offered by Antonie to be of such clear and satisfactory quality as to overcome the presumption that grantor delivered the deed to the grantee since it was shown to have been in his possession for many years. In fact, we think the circumstances relating thereto, outside of Antonie's testimony, indicate that she intended to and did complete the transfer of this property to her son during his lifetime subject to her life use thereof, but sought to defer the recording of the deed.

When Charles died he left a last will and testament which has been admitted and allowed to probate by the county court of Douglas County. By this will he gave Virginia all his property and she is the sole owner of

whatever interest he had in this property at the time of his death.

Having come to the conclusion that the decree of the trial court is wrong it is reversed with directions to the trial court to enter a decree in favor of Virginia quieting in her the title to the property described in the deed from Antonie to Charles, dated August 24, 1934, but subject to the right of Antonie to have the use thereof during her lifetime.

REVERSED AND REMANDED WITH DIRECTIONS.